James Leroy JACKSON,
Plaintiff-Appellee,

v.

JOHNS–MANVILLE SALES CORPORATION and Raybestos-Manhattan, Inc.,
Defendants-Appellants.

No. 82–4288.

United States Court of Appeals,
Fifth Circuit.

Jan. 22, 1986.

Roy C. Williams, Pascagoula, Miss., Lively M. Wilson, Dorothy J. Chambers, Louisville, Ky., John H. Holloman, III, William N. Reed, Jackson, Miss., for defendants-appellants.

Mark B. Stern, Dept. of Justice, Civil Div., Appellate Staff, Washington, D.C., for amicus curiae, U.S.

Richard F. Pate, Mobile, Ala., Danny E. Cupit, Jackson, Miss., Ronald L. Motley, Barnwell, S.C., Arthur R. Miller, Harvard Law School, Cambridge, Mass., for plaintiff-appellee.

Joseph R. Steele, Port Arthur, Tex., for amicus curiae, Abestos Claimants in the State of Tex.

Adoph J. Levy, New Orleans, La., for amicus curiae, The Ass'n of Trial Lawyers of America.

Broadus A. Spivey, Austin, Tex., amicus curiae, pro se.

Ransom P. Jones, Pascagoula, Miss., for Other Interested Persons.

Before CLARK, Chief Judge, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, and HILL, Circuit Judges.*

RANDALL, Circuit Judge:

This Mississippi diversity case involves plaintiff Jackson's efforts to recover compensatory and punitive damages from Johns-Manville Sales Corporation, Raybestos-Manhattan, Inc., and H.K. Porter Company, all manufacturers of asbestos products. Jackson was injured as a result of his exposure to asbestos products during the course of his employment as a shipyard worker. The district court, after a lengthy trial, entered judgment in favor of Jackson against all defendants except H.K. Porter Company in the amount of $391,500 in compensatory damages and $625,000 in combined punitive damages., On appeal, a panel of this court affirmed in part, reversed in part, and remanded for a new trial. *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506 (5th Cir.1984) ("Jackson I"). We granted en banc rehearing, which had the effect of vacating the panel opinion. *See* Fifth Circuit Internal Operating Procedures, *Rules of the United States Court of Appeals for the Fifth Circuit* 98 (July 1983). Upon rehearing en banc, we certified to the Mississippi Supreme Court three significant questions of Mississippi law. *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314 (5th Cir.1985) (en banc) ("Jackson II"). The Mississippi Supreme

Court declined certification without discussion. *Jackson v. Johns-Manville Sales Corp.*, 469 So.2d 99 (Miss.1985). The case is consequently back before us for resolution of the issues previously certified to the Mississippi Supreme Court.

The three issues left unresolved by this court's en banc opinion in *Jackson II* are as follows:

(1) whether a Plaintiff whose cause of action is based upon strict liability in tort can recover punitive damages against Defendants who have been or may be subjected to multiple awards of compensatory and punitive damages for the same wrongful conduct;

(2) whether a Plaintiff who does not presently have cancer can state a claim or recover damages in an action based upon strict liability in tort for mental distress resulting from his knowledge that he has an increased risk of contracting cancer in the future;

(3) whether a Plaintiff who does not presently have cancer can state a claim or recover damages in an action based upon strict liability in tort for the reasonable medical probability of contracting cancer in the future.

We now answer each question affirmatively, and affirm the judgment of the district court.

## I. PROCEDURE FOR CONSTRUING MISSISSIPPI LAW.[1]

The en banc court determined that Mississippi law, and not federal common law, properly governs the resolution of these issues.[2] Thus, we must interpret the law as would a Mississippi court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In making an *Erie*-guess, "[i]t is our duty ... to view ourselves ... as an inferior state court and to

---

* Judge Jerre S. Williams did not particpate in the decision of this case. Judge Edith H. Jones was not a member of this Court when this issue was submitted to the Court en banc and did net participate in this decision.

1. We dispense with a recitation of the facts. They are fully discussed in *Jackson I,* 727 F.2d at 509–11. The procedural history is recounted

in *Jackson II,* 750 F.2d at 1316–17. This opinion will address only those questions left unanswered by *Jackson II;* all other issues in this case, including, for example, the issue of Raybestos-Manhattan's liability, have been resolved and are not open for reconsideration.

2. *Jackson II,* 750 F.2d at 1322, 1323–27.

reach the decision that we think a state court would reach." *Dipascal v. New York Life Ins. Co.,* 749 F.2d 255, 260 (5th Cir.1985). Even "[i]n the absence of controlling precedent, we must ... decide ... issue[s] as we believe a Mississippi court would decide [them]." *Green v. Amerada-Hess Corp.,* 612 F.2d 212, 214 (5th Cir.), *cert. denied,* 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980).

█ As a federal court, "it is not for us to adopt innovative theories of [state law], but simply to apply that law as it currently exists," *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1217 (5th Cir.1985), and to rule as we believe the state's highest tribunal would rule, *Green,* 612 F.2d at 214. We are emphatically not permitted to do merely what *we* think best; we must do that which we think the Mississippi Supreme Court would deem best. *See, e.g., United States v. Little Joe Trawlers, Inc.,* 776 F.2d 1249, 1253 (5th Cir.1985) ("In our *Erie* role, we make no value judgments as to what [Mississippi] law ought to be."). If the law of Mississippi is to be changed, "[i]t is up to the Supreme Court of [Mississippi] and not this court to change the substantive law of that state." *Cargill, Inc. v. Offshore Logistics, Inc.,* 615 F.2d 212, 215 (5th Cir.1980). Finally, "under *Erie* we cannot skirt the clear import of state decisional law solely because the result is harsh." *Parson v. United States,* 460 F.2d 228, 234 (5th Cir.1972).

█ The denial of certification does not give us a license to change Mississippi law. We are still to apply the law as it exists. The privilege (or duty) of changing the law belongs to the Mississippi courts or legislature.[3] We certify questions in order to avoid having to make "unnecessary *Erie*

guesses," *Thompson v. Johns-Manville Sales Corp.,* 714 F.2d 581, 584 (5th Cir. 1983) (Goldberg, J., dissenting), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984), and to offer the state court the opportunity to alter existing law—in effect, to change direction. The denial of certification forces us to make the *Erie*-guess which we sought to avoid, but it does not enable us to alter existing law or to change direction. To paraphrase Judge Gee:

> In matters of [Mississippi] substantive law, our relationship to the [Mississippi] Supreme Court is all but identical to that of a [lower Mississippi] court. Indeed, if it differs at all as regards substantive innovation, it is weaker instead of stronger than that of such a court. Even in the rare case where a course of [Mississippi] decisions permits us to extrapolate or predict with assurance where that law would be had it been decided, we should perhaps—being out of the mainstream of [Mississippi] jurisprudential developments—be more chary of doing so than should an inferior state tribunal.

*Rhynes v. Branick Mfg. Corp.,* 629 F.2d 409, 410 (5th Cir.1980).

█ When making an *Erie* guess in the absence of specific guidance from the Mississippi Supreme Court, our prediction of state law looks to: (1) lower state court decisions and Supreme Court dicta, (2) the lower court ruling in this case, (3) the general rule on the issue, (4) the rule in other states looked to by Mississippi courts when they formulate the substantive law of Mississippi, and (5) other available legal sources, such as treatises and law review commentaries. *See generally Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); 19 C. Wright,

---

3. Johns-Manville and Raybestos-Manhattan, citing Judge Rubin's dissent in *Sturgeon v. Strachan Shipping Co.,* 731 F.2d 255 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 251, 83 L.Ed.2d 188 (1984), urge us to reinstate the panel opinion, as Judge Rubin urged in *Sturgeon,* now that the Mississippi Supreme Court has declined certification. Given our disposition of *Jackson II,* however, the alternative urged by defendants is unavailable. In *Jackson*

*II,* we expressly held that state tort law must govern the outcome of this case, yet the basis of *Jackson I* (the original panel opinion which defendants ask us to reinstate) was, in retrospect, less Mississippi tort law than it was federal common law. *See, e.g.,* 727 F.2d at 529–30; 750 F.2d at 1331. *Jackson II* concluded that this is not a proper case for the application of federal common law. 750 F.2d at 1327.

A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4507 (hereinafter Wright & Miller, *Federal Practice*); 1A (pt. 2) J. Moore, *Moore's Federal Practice,* ¶ 0.309[2]. As Professors Wright and Miller explain:

> In vicariously creating state law ..., the federal court may consider all available legal sources, including the Restatements of Law, treatises, law review commentaries, decisions from other jurisdictions whose doctrinal approach is substantially the same, and "the majority rule." *The federal court must keep in mind, however, that its function is not to choose the rule that it would adopt for itself; it must choose the rule that it believes the state's highest court ... is likely to adopt in the future.*

Wright & Miller, *Federal Practice* § 4507, at 100–03 (emphasis added). Numerous decisions of this Circuit have repeated, in some form or another, the rule of law stated by Professors Wright and Miller. For example, we recently explained that where the Mississippi Supreme Court has not expressly addressed an issue, this court "must ... do what a lower Mississippi court would do, predict the course of the Mississippi Supreme Court.... In that effort, '[a]bsent evidence to the contrary, we presume that the Mississippi courts would adopt the prevailing rule if called upon to do so.'" *Turbo Trucking Company v. Those Underwriters at Lloyd's London,* 776 F.2d 527, 529 (5th Cir.1985) (quoting *Hensley v. E.R. Carpenter Co.,* 633 F.2d 1106, 1109 (5th Cir.1980)) (citation omitted) (bracket in original). *See also Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc.,* 616 F.2d 212, 214–15 (5th Cir.1980) (looking to treatises and decisions in other states for guidance when there was no state law "directly on point").

Further, although the district court did not squarely resolve the issues we certified to the Mississippi Supreme Court and which we now confront, it did overrule defendants' objections to the jury instructions, deny their motions for directed verdict and for judgment notwithstanding the verdict, and enter judgment on the verdict in question. It therefore must be noted that we also give "special weight ... to the determination of the district court judge who is familiar with local law." *Green,* 612 F.2d at 214. *See also Acree v. Shell Oil Co.,* 721 F.2d 524, 525 (5th Cir.1983) ("district court's interpretation of state law will not be disturbed on appeal unless it is clearly wrong"); *Smith v. Mobil Corp.,* 719 F.2d 1313, 1317 (5th Cir.1983) (reviewing court must "apply state substantive law" and extend "great weight" to legal conclusions of district judge); *Avery v. Maremont Corp.* 628 F.2d 441, 446 (5th Cir. 1980) ("[W]hen state law is uncertain, we are hesitant to second guess the federal district court judge.").

With these principles in mind, we proceed to decide the issues presented as would a Mississippi court.

## II. PUNITIVE DAMAGES.

Johns-Manville ("JM") and Raybestos-Manhattan ("Raybestos"), joined by the United States as amicus, argue that punitive damages should and would be disallowed by the Mississippi Supreme Court in this case. First, JM and Raybestos [4] maintain that punitive damages are not available (or *ought* not be available),[5] as a matter of law, in cases of strict liability. Second, pointing to the specific and well-defined policy goals which punitive damages are designed to serve under Mississippi law, the defendants and the United States urge that punitive damages are not available as a matter of law in the context of a mass tort,[6] and that even if they are, the

---

**4.** JM and Raybestos will be referred to collectively as "defendants."

**5.** The defendants and the United States vacillate between arguing what the Mississippi Supreme Court *would* do and what, as a matter of *national* policy, *should* be done. As indicated in Part

I, *supra,* the substantive law we apply is that of Mississippi.

**6.** The Appendix to Chief Judge Clark's dissent in *Jackson II* indicated that as of March, 1983, 24,000 suits had been filed claiming asbestos-related injuries. In late 1984, new suits were

evidence was insufficient to submit the issue of punitive damages to the jury or to support the jury's verdict.

A. *Punitive Damages and Strict Liability.*

■ The defendants point out that the Mississippi Supreme Court has not expressly held that punitive damages are available in cases of strict liability. They then contend that punitive damages would not be allowed. The defendants reason that under Mississippi law, punitive damages require a showing of intentional misconduct or gross negligence by the producer, which is conceptually inconsistent with strict liability in tort since strict liability focuses on the product, not the producer.

This argument is fundamentally flawed. The fact that a plaintiff proceeds under a theory of strict liability does not bar that plaintiff from also introducing evidence of the defendant's gross and wanton misconduct, for which the defendant, under Mississippi law, deserves punishment in the form of punitive damages. As Judge Higginbotham, now a member of this court, wrote as a district judge in a Texas diversity case:

> The meaning of the argument that strict liability and recovery of punitive damages are conceptually incompatible is not clear. Certainly one is said to be a no fault and the other a fault concept.... The bases of recovery for strict liability and exemplary damages are different. They are independent concepts. The purpose of one is compensation and the purpose of the other is deterrence. The focus of one is redistribution of loss and the focus of the other is punishment.... Because they are different concepts, their differences in premises and purposes are beside the point....
>
> In sum, simultaneous pursuit of actual damages bottomed on principles of strict liability and exemplary damages bottomed on fault concepts are essentially

being docketed at a rate of 500 per month. *See* 750 F.2d at 1336. According to JM, it has been

matters of trial efficiency and presents no true substantive issues.

*Maxey v. Freightliner Corp.,* 450 F.Supp. 955, 961–62 (N.D.Tex.1978), *aff'd,* 623 F.2d 395 (5th Cir.1980), *on reh'g,* 665 F.2d 1367 (5th Cir.1982), *appeal after remand,* 722 F.2d 1238 (5th Cir.), *modified and reh'g denied,* 727 F.2d 350 (5th Cir.1984).

A plaintiff who elects to proceed under a strict liability theory does so merely in order to facilitate a finding of liability for compensation. *See, e.g., Jackson I,* 727 F.2d at 511–15. It remains necessary, however, for the plaintiff to demonstrate much more before he is entitled, under Mississippi law, to punitive damages. The plaintiff must establish that the defendants' conduct was wanton, reckless, or indifferent to the rights of others. *See, e.g., Sheffield v. Sheffield,* 405 So.2d 1314 (Miss.1981); *Standard Life Ins. Co. of Indiana v. Veal,* 354 So.2d 239, 247 (Miss.1977). As another court has noted:

> [T]here is no theoretical problem in a jury finding that a defendant is liable because of the defectiveness of a product and then judging the conduct of the defendant in order to determine whether punitive damages should be awarded on the basis of "outrageous conduct" in light of the injuries sustained by the plaintiff.... By dispensing with the need to prove fault for purposes of establishing liability under section 402A, the law of strict liability does not preclude consideration of "aggravated fault," if the plaintiffs can properly meet their burden of demonstrating sufficient evidence of the defendant's outrageous conduct.

*Neal v. Carey Canadian Mines Ltd.,* 548 F.Supp. 357, 378 (E.D.Pa.1982), *aff'd,* 760 F.2d 481 (3d Cir.1985).

In this case, Jackson did demonstrate much more than was needed to recover compensatory damages under strict liability. *See infra* note 12. We do not believe that the Mississippi Supreme Court would regard this evidentiary showing as irrele-

named as a defendant in over half of these suits. *See Jackson II,* 750 F.2d at 1323.

vant, or deny Jackson the punitive damages to which the jury found him entitled on the basis of this evidence, merely because Jackson rooted his liability claim in a theory of strict liability.

Not a single Mississippi case supports the defendants' theory.[7] On the contrary, virtually every court to have considered this matter has ruled that punitive damages *are* permissible in strict liability cases. For example, the following decisions have permitted punitive damage awards in strict liability, asbestos-related cases: *Johns-Manville Sales Corp. v. Janssens*, 463 So.2d 242 (Fla.App.1984), *review denied*, 467 So.2d 999 (Fla.1985); *Froud v. Celotex Corp.*, 107 Ill.App.3d 654, 63 Ill.Dec. 261, 437 N.E.2d 910 (1982), *rev'd on other grounds*, 98 Ill.2d 324, 74 Ill.Dec. 629, 456

---

**7.** We are not unmindful of authorities cited by defendants which are alleged to support the rationale of their theory. These cases include: *Gold v. Johns-Manville Sales Corp.*, 553 F.Supp. 482 (D.N.J.1982); *Butcher v. Robertshaw Controls Co.*, 550 F.Supp. 692, 705 (D.Md.1981); *Sanford v. Celotex Corp.*, 598 F.Supp. 529 (M.D. Tenn.1984); *Rimlinger v. Johns-Manville*, (unpublished slip op., Cir.Ct.Tenn., January 13, 1982); *In re No. Dist. of Cal. "Dalkon Shield" IUD Products Liability Litigation*, 526 F.Supp. 887 (N.D.Cal.1981), *vacated*, 693 F.2d 847 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). In addition, the panel in *Jackson I* cited *Walbrun v. Berkel, Inc.*, 433 F.Supp. 384 (E.D.Wisc.1976). *Jackson I*, 727 F.2d at 529. Contrary to the defendants' assertions, these cases do not uniformly stand for the proposition that punitive damages are not permitted in cases where liability is predicated on strict liability in tort.

For example, *Walbrun* held that punitive damages are not available in Wisconsin in cases of strict liability, but the court based its holding on the fact that punitive damages are not available generally in Wisconsin even in cases of gross negligence. In this respect, Mississippi law could not be more different from that of Wisconsin. In addition, a different district court in Wisconsin held precisely the opposite, ruling that punitive damages are recoverable in a products liability case where the plaintiff shows the defendant's conduct to have been wanton or reckless. *See Drake v. Wham-O Manufacturing Co.*, 373 F.Supp. 608 (E.D.Wisc.1974). Finally, the Wisconsin Supreme Court effectively overruled *Walbrun* in *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437 (1980). *See also Klawes v. Firestone Tire & Rubber Co.*, 572 F.Supp. 116 (E.D.Wisc.1983); *Simmons v. Atlas Vac Machine Co.*, 475 F.Supp. 1181 (E.D.Wisc. 1979).

*Gold* is no longer followed in the federal district court in New Jersey, *Gogol v. Johns-Manville Sales Corp.*, 595 F.Supp. 971, 975–76 (D.N.J. 1984), due to a New Jersey appeals court's rejection of *Gold's* holding.

In *Butcher*, the district court, applying Maryland law, did permit punitive damages on a claim of negligence because the plaintiffs had alleged, with respect to that claim, that the defendants' conduct had been reckless and indifferent to the rights of others. The court then indicated that punitive damages were not recoverable under strict liability precisely because plaintiffs could recover under that theory *without* having to demonstrate reckless indifference; that demonstration would be made in connection with the negligence claim. There is certainly no suggestion in *Butcher* that a strict liability plaintiff who *also* proves that the defendant acted with reckless indifference would be barred from collecting punitive damages merely because the plaintiff established liability on the basis of strict liability in tort. *See* 550 F.Supp. at 704–05.

The continued vitality of *Sanford* is, to say the least, doubtful following the Sixth Circuit's opinion in *Cathey v. Johns-Manville Sales Corp.*, 776 F.2d 1565 (6th Cir.1985), which decided that Tennessee law permits an award of punitive damages in a strict products liability action. In *Rimlinger*, the First Circuit Court for Davidson County, Tennessee, did conclude that "punitive damages are inappropriate as inconsistent with the theory of [strict liability in tort], and [that] insofar as this case is based upon negligence ... the multitude of pending product liability actions serve as sufficient deterents [sic] and punishment for willful or gross negligence." We have found no other case, however, in Tennessee, in any other state court, or in any federal court, which cites or relies upon *Rimlinger*. In addition, the language in *Rimlinger* suggests that the court was concerned exclusively with the deterrent effect of punitive damages on the *defendant*, in that case Johns-Manville. The Sixth Circuit in *Cathey* rejected such a narrow reading of Tennessee law, noting that general as well as specific deterrence of wrongdoing is a purpose of punitive damages in Tennessee. 776 F.2d at 1570. In any event, the law in Mississippi takes into account both deterrent functions. *See, e.g., Veal*, 354 So.2d at 247.

In the *Dalkon Shield* case, a federal district court in California rightly noted that the "law on punitive damages was created in an era of single plaintiff versus single defendant disputes and has not yet been adapted to the complexity of multi-party litigation." 526 F.Supp. at 900. However, the court had no doubt that punitive damages were available "in the products liability context"; indeed, the court attempted to make them manageable by certifying the case, upon application by the defendants, as a class action. 526 F.Supp. at 900.

N.E.2d 131 (1983); *Brotherton v. Celotex Corp.*, 202 N.J.Super. 148, 493 A.2d 1337 (1985); *Moran v. Johns-Manville Sales Corp.*, 691 F.2d 811 (6th Cir.1982) (Ohio law); *Thiry v. Armstrong World Industries*, 661 P.2d 515 (Okla.1983); *Martin v. Johns-Manville Corp.*, 322 Pa.Super. 348, 469 A.2d 655 (1983), *vacated on other grounds*, 494 A.2d 1088 (Pa.1985); *Cathey v. Johns-Manville Sales Corp.*, 776 F.2d 1565, 1569 (6th Cir.1985) (applying Tennessee law). A New Jersey state court, considering precisely those issues before us now, concluded that in *every* jurisdiction where the argument that punitive damages are incompatible with strict liability had been raised, it was decided that punitive damages are in fact permitted. *Fischer v. Johns-Manville Corp.*, 193 N.J.Super. 113, 472 A.2d 577, 582–83 (App.Div.), *certif. granted*, 97 N.J. 598, 483 A.2d 137 (1984). *See also* Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L. Rev. 1257, 1269–71 (1976) (use of punitive damages in strict liability cases is "established," and "there is no sound reason for not allowing a plaintiff seeking punitive damages to show a greater culpability for that purpose than he must for his underlying theory of compensatory liability"). Given the principles which guide our inquiry, *see supra* Part I, it is germane "that the Hawaii, Indiana, Missouri, Pennsylvania, South Carolina, Tennessee and Virgin Island cases all reflect the prediction by federal courts in diversity actions that the state whose law governed and which had not yet itself addressed the issues would permit punitive damages in products liability actions." *Id.* at 583.[8] We must assume that a Mississippi court would follow this rule that prevails by an overwhelming margin.

The position urged by the defendants would represent a significant development in principles of tort law. To carve out a strict liability exception to punitive damages would be to make new Mississippi law. That is not our role as a diversity court.

### B. *Punitive Damages in the Mass Tort Case.*

The defendants attempted at two different points in the trial to convince the district court that this case was not appropriate for an award of punitive damages. First, pursuant to Fed.R.Civ.P. 51, they objected to any jury instruction on punitive damages as a matter of policy, contending that punitive damages should not be available in a "mass tort" product liability action. Further, they contended that even if punitive damages might be available as a matter of law, the evidence in this case was insufficient to entitle the plaintiff to have the issue submitted to the jury. The trial judge overruled the objections. Second, after the jury awarded the plaintiff punitive damages, the defendants moved for a judgment notwithstanding the verdict or for a new trial, Fed.R.Civ.P. 50, simply repeating their policy argument that punitive damages should not be available in a mass tort case as a matter of law—the same argument which had already been rejected by the district judge. The district judge again rejected the defendants' argument, and de-

---

**8.** Courts which have been called upon to address the issue of whether punitive damages are available in cases of strict liability have almost uniformly held that punitive damages are available. In addition to the cases cited in the text, *see, e.g., Palmer v. A.H. Robins Co.*, 684 P.2d 187 (Colo.1984) (en banc); *American Laundry Machinery Industries v. Horan*, 45 Md.App. 97, 412 A.2d 407 (1980); *Campus Sweater & Sportswear Co. v. M.B. Kahn Construction Co.*, 515 F.Supp. 64 (D.S.C.1979), *aff'd*, 644 F.2d 877 (4th Cir. 1981); *Maxey v. Freightliner Corp.*, 450 F.Supp. 955 (N.D.Tex.1978), *aff'd*, 623 F.2d 395 (5th Cir. 1980), *on reh'g*, 665 F.2d 1367 (5th Cir.1982), *appeal after remand*, 722 F.2d 1238 (5th Cir. 1984), *modified and reh'g denied*, 727 F.2d 350 (5th Cir.1984); *Sturm, Ruger & Co., Inc. v. Day*, 594 P.2d 38 (Alaska 1979), *modified*, 615 P.2d 621 (Alaska 1980), *on reh'g*, 627 P.2d 204 (Alaska), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981); *Unified School District No. 490 v. Celotex Corp.*, 629 P.2d 196, 6 Kan.App.2d 346 (1981); *Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727 (Minn.), *cert. denied*, 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980); *Rinker v. Ford Motor Co.*, 567 S.W.2d 655 (Mo.App.1978); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437 (1980); *Acosta v. Honda Motor Co., Ltd.* 717 F.2d 828 (3d Cir.1983) (Virgin Islands law).

nied the motion. We conclude that the district judge properly overruled the defendants' objections to the punitive damages instruction, and that the defendants were not entitled to a judgment notwithstanding the verdict or a new trial. The trial court properly declined the defendants' invitation to construe the law of Mississippi to prevent an award of punitive damages in a mass tort case as a matter of law. Further, the evidence introduced at trial was sufficient to allow the issue of punitive damages to go to the jury and fully supports the jury's award.

### 1. *Availability of Punitive Damages in a Mass Tort Case as a Matter of Law.*

The defendants argued before the instructions were given that the punitive damages issue should not go to the jury as a matter of law, and, after failing in that, they contended that the punitive damages award should be vacated. The defendants offered the identical legal theory in support of their objections to the jury instruction on both occasions: The uniqueness of the factual context in a mass tort case makes punitive damages inappropriate as a matter of law. As in any appeal involving a challenge to the accuracy or sufficiency of jury instructions as a matter of law, the question that we review is whether the jury instructions were a fair and accurate description of Mississippi law on punitive damages, or whether the defendants' objection to the instructions pursuant to Fed.R. Civ.P. 51 should have been upheld. *Bass v. International Brotherhood of Boilermakers*, 630 F.2d 1058, 1062 (5th Cir.1980) (role of court reviewing legal sufficiency of jury instructions in diversity case is to examine applicable state law); *Rohner, Gehrig & Co. v. Capital City Bank*, 655 F.2d 571, 580 (5th Cir.1981) (in reviewing claim of error of law in jury instructions in diversity case, court evaluates accuracy of substance of charge under controlling state law); *see generally* 5A *Moore's Federal Practice* ¶ 51.06 (no reversible error if jury is given full statement of applicable law).[9]

The defendants cite no Mississippi cases to support their contention that punitive damages are unavailable in what they state is a mass tort case.[10] The defendants have not referred to any Mississippi decision which has even swayed in the direction of changing the rules in a mass tort case. In terms of suggesting how a Mississippi court would view their policy argument

---

**9.** A motion made under Fed.R.Civ.P. 50, whether it be a motion for a directed verdict or a motion for judgment notwithstanding the verdict, should not be used to test the legal sufficiency of jury instructions. Rather, a Rule 50 motion is appropriate to allege "a complete absence of pleading or proof on an issue or issues material to the cause of action or defense," or "where there are no controverted issues of fact upon which reasonable men could differ." 5A *Moore's Federal Practice* ¶ 50.02[1], at 50–16. *See generally Sulmeyer v. Coca-Cola Co.*, 515 F.2d 835, 841 (5th Cir.1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc).

**10.** Even assuming that the defendants' argument might have a reasonable basis in the law, it seems unlikely that their contention could prevail because they did not offer to the district judge any factual support for their argument. Rather, the district judge had before him only the unsworn allegations of counsel concerning the impact of punitive damage awards on future compensatory damage awards. There is simply no proof in this record that punitive damages awards may impair the defendants' ability to pay compensatory damages awards in the future. JM did state in an affidavit submitted to the district judge (not included in the evidence at trial) that as of 1983, it had been held liable for punitive damages to fifteen different plaintiffs. However, before the district court, the defendants acknowledged in oral argument on their Rule 51 motion "that no punitive damage awards have been paid to date." 55 Record at 2288, 2290. The defendants did not offer any evidence that any punitive damage awards have been paid, or that the recovery of compensatory damage awards by other asbestos victims is being threatened by punitive damage awards. Even with respect to their most basic argument, then, the defendants have provided no factual predicate for a favorable ruling. *See generally* Seltzer, *Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control*, 52 Fordham L.R. 37, 39 & n. 11 (1983); *see also* Brief for United States at 15 (stating that by 1982, JM had been assessed $6.1 million in punitive damages in favor of 18 plaintiffs).

that is clearly at odds with settled tort principles, the defendants' silence is conspicuous and enlightening.

The focus of the defendants' argument is that the policies justifying punitive damages in Mississippi are not implicated in the mass tort case. They conclude that punitive damages should therefore be unavailable as a matter of law. The defendants note correctly that under Mississippi law, plaintiffs have no "right" to recover punitive damages. *See, e.g., Tideway Oil Programs, Inc. v. Serio,* 431 So.2d 454, 461 (Miss.1983). Rather, punitive damages are granted only in "extreme" cases, *Snowden v. Osborne,* 269 So.2d 858, 860 (Miss.1972), and they "should be allowed only with caution and within narrow limits," *Standard Life Ins. Co. of Indiana v. Veal,* 354 So.2d 239, 247 (Miss.1977). The law authorizes punitive damage awards somewhat reluctantly, because they alter the settled principle that a remedy in tort should simply make the plaintiff whole. However, greater societal concerns justify punitive damages in the exceptional case, because in extreme circumstances wrongdoers deserve punishment both as an expression of society's disfavor of their actions "and as an example so that others may be deterred from the commission of similar offenses." *Snowden,* 269 So.2d at 860. Further, punitive damages reward individuals who serve as "private attorneys general" in bringing wrongdoers to account. *Veal,* 354 So.2d at 247. *Cf. Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 1639, 75 L.Ed.2d 632 (1983) (discussing purposes of punitive damages); *Restatement (Second) of Torts* § 908(1) (exemplary damages punish outrageous conduct and deter actor and others from similar conduct in future).

Given these specific functions which punitive damages serve, the defendants and the United States insist that the Mississippi Supreme Court would not allow them here. As JM sums up Mississippi law:

> Mississippi courts … neither regard punitive damages as a right to which plaintiffs are entitled [citing *Tideway* ] nor demonstrate such a callous disregard for the results of punitive damages which result in the financial destruction of a defendant [citing *T.C.L. Inc. v. Lacoste,* 431 So.2d 918 (Miss.1983) ]. Rather, the Mississippi courts have recognized a duty for both trial and appellate courts to scrutinize carefully all punitive damages cases to be sure that societal interests are served and that punitive damages are not awarded except in the most extreme cases where the plaintiff is not motivated by vindictiveness, reprisal, or greed.

JM's Brief Following Denial of Certification at 15–16 (hereinafter "JM's brief").

The defendants' counsel asserted to the trial judge that punitive damages should not be awarded since multiple punitive damage awards might preclude future plaintiffs from recovering even compensatory damages.[11] They pointed out to the trial judge that punitive damages serve to punish defendants, and contended that, as a result of the voluminous asbestos litigation, they have already been punished enough. They stated to the trial judge that punitive damages serve to motivate "private attorneys general" to bring suit, but argued that persons injured by asbestos have motivation enough to sue. Finally, they acknowledged to the trial judge that punitive damages deter wrongful conduct, but they insisted that the asbestos litigation is deterrence enough.

---

11. Although the defendants argue that the claims of future plaintiffs may be endangered as a result of the number of suits involving them, they do not indicate why their ability to pay future damage awards will be more affected by punitive damage awards than by the multiplicity of compensatory damage awards. Other courts have found "that the threat of insolvency from payment of punitive damages was greatly exaggerated." *Brotherton v. Celotex Corp.,* 202 N.J.

Super. 148, 493 A.2d 1337, 1344 (1985) (citing *Fischer v. Johns-Manville Corp.,* 193 N.J.Super. 113, 472 A.2d 577 (App.Div.), *certif. granted,* 97 N.J. 598, 483 A.2d 137 (1984). In addition, one court has found that, "[w]ith respect to Johns-Manville, it is clear that its present insolvency proceedings are primarily attributable to its exposure to compensatory rather than punitive damages." *Fischer,* 472 A.2d at 586.

The defendants' analysis neglects to pay any attention to the heavy burden the plaintiff must meet—and, as we indicate *infra,* the burden Jackson *did* meet—before the punitive damage issue may properly be submitted to the jury and punitive damages may be awarded. That heavy burden is designed to take into account the interests of both society and defendants by ensuring that punitive damages are awarded in only the unusual case where the defendant must be made an example because of its especially egregious behavior.

In Mississippi, a jury may award punitive damages only if the plaintiff succeeds in demonstrating that the defendant was grossly negligent or that the defendant's conduct was especially opprobrious, *see, e.g., Commodore Corp. v. Bailey,* 393 So.2d 467 (Miss.1981); *Sheffield v. Sheffield,* 405 So.2d 1314 (Miss.1981), or if it finds that the defendant's behavior exhibited "gross disregard" for the rights of the plaintiff. *National Mortgage Co. v. Williams,* 357 So.2d 934 (Miss.1978). In *Veal,* the leading case on punitive damages, the Mississippi Supreme Court "recognize[d] that punitive damages are assessed as an example and warning to others and should be allowed only with caution and within narrow limits." 354 So.2d at 247. Then, before examining whether "the evidence support[s] an award for punitive damages," the court made plain that " '[p]unitive damages may be recovered for a willful and intentional wrong, or for such gross negligence and reckless negligence as is equivalent to such wrong.' " 354 So.2d at 247 (quoting *Seals v. St. Regis Paper Co.,* 236 So.2d 388, 392 (Miss.1970)). In this case, the district court's charge to the jury clearly and accurately instructed that punitive damages could be returned only if the jury believed that the requisite misconduct had been demonstrated.[12]

12. The district court's charge instructed the jury as follows:

> If you should find from a preponderance of the evidence in this case that the plaintiff is entitled to a verdict for actual or compensatory damages, against one or more of the defendants herein, and further find that the act or omission of that particular defendant or defendants against whom you do find, which proximately caused actual injury or damages to the plaintiff was maliciously or wantonly done by that particular defendant or defendants, then in that event you may, if in the exercise of your discretion you unanimously choose to do so, add to the award of actual damages such amount as you shall unanimously agree to be proper, as punitive and exemplary damages against any one or more of the defendants against whom who have found liability and actual damages in favor of the plaintiff, if any.

56 Record at 2451.

The district court defined a "malicious act" as one prompted or accompanied by ill-will, spite, or grudge; it defined "wanton act" as one done in reckless or callous disregard of, or with indifference to, the rights of the plaintiff. *Id.* Before the jury could return punitive damages, the district court repeated that the jurors must "unanimously find, from a preponderance of the evidence in this case, that a particular defendant's act or omission, which proximately caused [actual] damage to the plaintiff, was maliciously or wantonly done." 56 Record at 2452.

One court, apparently having viewed evidence similar to that in the record of this case, concluded that "... there is voluminous evidence that the asbestos industries have known for decades of the dangers involved in the use of asbestos products." *Johns-Manville Sales Corp. v. Janssens,* 463 So.2d 242, 249 n. 5 (Fla.App.1984), *review denied,* 467 So.2d 999 (Fla.1985). JM apparently had a policy of not telling its workers whom company officials knew to have asbestosis that they in fact had asbestosis. Perhaps this was deemed by the jury to have been a policy that was recklessly indifferent. *See, e.g.,* 49 Record at 417, 582; *see also* Deposition of Wibur Ruff. The jury might also have concluded that the asbestos companies' practice of directing their doctors not to participate in programs devoted to learning the association between asbestos and lung-related disease reflected malicious behavior or reckless indifference to the rights of those workers who would be around asbestos. *See, e.g.,* Testimony of Dr. Nicholas Demy, 51 Record at 1137; *see generally* 50 Record at 800–16. Finally, the Sumner Simpson papers, one of which consisted of a letter from the President of Raybestos to the legal director of JM suggesting that "the less said about asbestos the better off we are," might have been regarded by the jury as reckless, indifferent, or even malicious behavior. (Or perhaps the jury was more outraged by the response to this letter from the legal director of JM. He wrote: "I quite agree that our interests are best served by having asbestosis receive the minimum amount of publicity.") *See* Closing Argument of Jackson's Counsel, 55 Record 2300–2333, 2398–2400; 56 Record 2401–2419, esp. 2410–11.

Yet the defendants do not directly contend that the jury instructions inadequately or incorrectly summarized the existing legal rules, which is the usual issue in a Rule 51 objection to jury instructions. *See Bass,* 630 F.2d at 1062. They argue instead that "facts" not a part of this record mandate a drastic change in the law of remedies. They urge us to determine that when a defendant injures tens of thousands and manifests reckless disregard for the victims' lives and welfare, punitive damages should be unavailable as a matter of law.

We believe that the Mississippi Supreme Court would not deny to its own citizens the right to recover that which citizens of dozens of other states are already entitled to recover, and that the district court correctly charged the jury on the applicable legal principles. As Chief Judge Clark, dissenting in *Jackson II,* noted: "Despite the absence of clear controlling state court precedent as to whether punitive damages should be available in product liability actions ..., *there can be no doubt that the Supreme Court of Mississippi would hold that Mississippi citizens should not be denied the right to claim punitive damages awards and to seek recovery for probable future diseases ... now accorded to citizens in other states."* 750 F.2d at 1334 (emphasis added).

There appears to be no Mississippi case law directly on the issue of the availability of punitive damages in the mass tort context. Absent the controlling authority of the Mississippi Supreme Court or the guiding authority of lower Mississippi courts, we must look to the jurisprudence of other states in formulating substantive law, as a Mississippi court would. *See, e.g., Hall v. Hilbun,* 466 So.2d 856 (Miss.1985) (examining development of medical malpractice principles in other states); *Lucas v. Mississippi Housing Authority No. 8,* 441 So.2d 101, 106–07 (Miss.1983) (Walker, J., specially concurring) (reviewing negligence laws of numerous states).

The simple fact of the matter is that no appellate court has accepted the defendants' theory in a reported decision. In Oregon, for example, the Supreme Court recently ruled in a "mass tort" case that the "financial interests of the malicious and wanton wrongdoer must be considered in the context of societal concern for the injured and the future protection of society." *State ex rel. Young v. Crookham,* 290 Or. 61, 618 P.2d 1268, 1271 (1980). An Illinois court recently explained that it did "not believe that defendants should be relieved of liability for punitive damages merely because, through outrageous misconduct, they may have managed to seriously injure a large number of persons." *Froud v. Celotex Corp.,* 107 Ill.App.3d 654, 63 Ill. Dec. 261, 264, 437 N.E.2d 910, 913 (1982), *rev'd on other grounds,* 98 Ill.2d 324, 74 Ill.Dec. 629, 456 N.E.2d 131 (1983). Pennsylvania, New Jersey,[13] Florida, Tennessee, and Texas each permits plaintiffs to recover punitive damages in mass tort cases. *Martin v. Johns-Manville Corp.,* 322 Pa. Super. 348, 469 A.2d 655 (1983), *vacated on other grounds,* 494 A.2d 1088 (Pa.1985); *Fischer v. Johns-Manville Corp.,* 193 N.J. Super. 113, 472 A.2d 577 (App.Div.), *certif. granted,* 97 N.J. 598, 483 A.2d 137 (1984); *Brotherton v. Celotex Corp.,* 202 N.J.Super. 148, 493 A.2d 1337 (1985); *Celotex Corp. v. Pickett,* 459 So.2d 375 (Fla.App. 1984); *Cathey v. Johns-Manville Sales Corp.,* 776 F.2d 1565, (1985) (applying Tennessee law); *Hansen v. Johns-Manville Products Corp.,* 734 F.2d 1036 (5th Cir. 1984) (applying Texas law), *cert. denied,* —— U.S. ——, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985).

---

**13.** There is a contrary decision in New Jersey, a federal district court decision attempting to predict state law, to which defendants frequently refer. *Gold v. Johns-Manville Sales Corp.,* 553 F.Supp. 482 (D.N.J.1982). We note, however, that New Jersey state and federal courts have ruled differently and have declined to follow *Gold.* The New Jersey court which decided *Fischer,* 193 N.J.Super. 113, 472 A.2d 577, persuasively argues that the federal district court in *Gold* erroneously predicted what the New Jersey Supreme Court will do. 472 A.2d at 583–84. Moreover, a recent federal court decision in New Jersey expressly rejected *Gold* in light of *Fischer, Gogol v. Johns-Manville Sales Corp.,* 595 F.Supp. 971, 975–76 (D.N.J.1984).

Moreover, several commentators writing on the issue of punitive damages in mass tort cases have concluded that punitive damages should be generally available in mass tort cases. *See, e.g.,* Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1258 (1976); Seltzer, *Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control,* 52 Fordham L.Rev. 37 (1983); Note, *In Defense of Punitive Damages,* 55 N.Y.U.L.Rev. 303 (1980). The central thesis of much of the scholarly writing in this area is that the problems assertedly caused by awarding punitive damages in the mass tort context are typically more apparent than real. Further, in response to the speculation that punitive damage awards may prevent compensatory damage awards in the future due to financial pressures on the defendants, these authors conclude that if serious societal difficulties do *in fact* arise, they can be addressed by less drastic means than a complete bar to the availability of punitive damages as a matter of law.

The rule of law requested by the defendants would require a modification of Mississippi's approach to fashioning its substantive law, as well as a modification of the law itself. For this court to make such a modification in the absence of explicit guidance from the Mississippi courts would be to abdicate our proper role as a diversity court. As the Sixth Circuit concluded in a recent diversity case applying Tennessee law, the "serious public policy concerns" raised by asbestos case defendants seeking to avoid punitive damages were not "a proper basis upon which this Court can rest a diversity decision. . . . The relief sought by JM may be more properly granted by the state or federal legislature than by this Court." *Cathey v. Johns-Manville Sales Corp.,* 776 F.2d 1565, 1569–70 (6th Cir. 1985).

Our duty is to apply the law of Mississippi as it exists. We act as an intermediate Mississippi court in this case; we cannot blaze new trails in Mississippi law or set forth rules that find no application in Mississippi jurisprudence. That responsibility lies with the Mississippi Supreme Court. That court has not evinced any affinity for the defendants' theory, nor has any other Mississippi court. The trial judge in this case, whose interpretation of Mississippi law we must accord some deference, rejected the defendants' arguments. Virtually every court to have decided this mass tort issue—including state courts as well as federal courts applying state law in diversity actions—has permitted the imposition of punitive damages.[14]

The defendants and the United States contend nevertheless that regardless of existing Mississippi law, punitive damages should not be awarded in this context, where there have been thousands of persons injured by asbestos and where thousands of plaintiffs have sued, since the potential ramifications of multiple damage awards on the defendants' financial viability may be severe, with the consequence that future plaintiffs may be unable to recover even compensatory damages.[15] JM's position is that in "the asbestos litigation, punitive damages ... carry the very real prospect of financial destruction for

14. Like many other plaintiffs in diversity cases filed in federal courts, the appellant here is asking that we anticipate the birth of a state law doctrine in the "womb of time, but whose birth is distant." We have been asked to deliver prematurely a new doctrine of Pennsylvania tort law, and as a federal court we are unwilling to do so. *Vargus v. Pitman Mfg. Co.,* 675 F.2d 73, 76 (3d Cir.1982) (citation and footnote omitted). Unlike the tort law theory proposed in *Vargus,* that proposed by the defendants in this case is not even visible in the womb of time. We refuse to clone their theory into Mississippi law.

15. The defendants argue that *no* plaintiff in a mass tort case should be able to recover punitive damages. They do not contend that punitive damages should be available only to the first plaintiffs who bring actions in mass tort cases. One rationale for punitive damages, as noted above, is that injured individuals should be encouraged to act as private attorneys general. That interest would seem to be a particularly compelling factor supporting punitive damages for Jackson, one of the first Mississippi plaintiffs to prosecute a case of this nature.

the defendant [and] threaten the possible recovery of thousands of other injured parties." JM's brief at 8. Similarly, the United States acknowledges that the "defendants' conduct would clearly warrant the lower court's punitive damage sanction if the full scope of the asbestos litigation were ignored, [but] the justifiable outrage at defendants' conduct should not permit a damage award that in fact runs counter to the public interest." Brief for the United States at 3.

There is a fundamental inconsistency within this argument, an inconsistency which many other courts have pointed out and have ultimately found to be dispositive. Punitive damages exist in part to punish defendants whose conduct merits punishment. As the defendants repeatedly point out, punitive damages are awarded only in extreme cases. *See, e.g., Snowden,* 269 So.2d at 860. Yet the defendants and the United States argue that in the *most* extreme cases, when a defendant commits an especially pernicious act which injures a myriad of innocent persons, cases which one might imagine to be especially suitable for the imposition of punitive damages, the law should shield the defendant from punitive damages by the sheer magnitude of its wrong.

Mississippi law already provides that the defendants could have introduced to the jury evidence of their asserted dire financial straits, and of the possibility that punitive damage awards might prevent other plaintiffs from recovering even compensatory damages. *See infra* at II.B.2. They could have attempted to convince the finder of fact that they did not need to be deterred, or that the effect of punitive damage awards would cripple their companies. They could have produced evidence of their contingent liability and then requested that the trial judge specifically instruct the jury that this evidence be taken into account in assessing the amount of punitive damages,

if any. If the defendants had done so, the finder of fact could have assessed the merits of their contentions. Thereafter, the trial judge could have reviewed the propriety of the award, in light of the evidence supporting the defendants' contentions, on either a motion for judgment notwithstanding the verdict, Fed.R.Civ.P. 50(b), *see Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc), or a motion to remit the punitive damages, *see Lowe v. General Motors Corp.,* 624 F.2d 1373, 1383 (5th Cir. 1980) ("District Courts have not hesitated to remit even punitive damages"); *Gilbert v. St. Louis—San Francisco Railroad Co.,* 514 F.2d 1277, 1280–81 (5th Cir.1975). However, the defendants did not elect to follow the path which was available to them under existing law to bring their concerns about insolvency and the lack of need for deterrence to the attention first of the finder of fact and then to the judge.[16]

■ There is no basis for us to disturb the trial court's decision that punitive damages are available as a matter of law in mass tort contexts. We conclude that the Mississippi Supreme Court would not deny punitive damages in cases of strict liability or cases of mass tort as a matter of law.

2. *Sufficiency of Evidence for Punitive Damages Instruction.*

In addition to arguing to the trial judge that the punitive damages issue should not go to the jury as a matter of public policy, the defendants contended in passing that the evidence introduced by the plaintiff could not lead reasonable jurors to conclude that their conduct in fact warranted punitive damages. Therefore, they moved under Rule 50 for a directed verdict on the issue, and for a verdict notwithstanding the judgment after the jury's adverse decision.

■ Our review of a challenge to the appropriateness of an award of punitive damages in light of the evidence *in this*

---

**16.** We fully recognize the difficulties presented to the defendants in having to put before the jury evidence of an enormous volume of litigation similar to this case and of their actual or potential insolvency resulting therefrom. This situation is one in which the trial court should consider the possibility of a separate trial on punitive damages under Fed.R.Civ.P. 42(b) after the issues of liability and compensatory damages have been decided.

*record* is limited to the question of whether the testimony and evidence could reason-ably justify the imposition of punitive damages. *See Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc).[17] In this case, the threshold issue is whether reasonable jurors could have concluded that the defendants' behavior was so malicious or grossly indifferent as to warrant punitive damages under Mississippi law. *Id.; Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1374 (5th Cir.1982) (en banc), *appeal after remand,* 722 F.2d 1238 (5th Cir.), *modified and reh'g denied,* 727 F.2d 350 (5th Cir.1984). In addressing this issue, we must consider all the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Boeing,* 411 F.2d at 374. "[I]f there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury." *Id.* at 374–75.

■ Reviewing the record in the light most favorable to the plaintiff leaves no room for doubt that the jury had an adequate basis for concluding that the defendants had shown gross disregard for Jackson's rights and that Jackson was therefore entitled to punitive damages.[18]

As a matter of substantive Mississippi law, the financial condition of the defendant must be taken into account by the jury when it sets a punitive damage award, and by an appellate court when it reviews the award. *See e.g., T.C.L., Inc. v. Lacoste,* 431 So.2d 918, 923 (Miss.1983) (punitive

damage award set aside because "[t]he proof in the case sub judice failed to adequately establish the net worth of appellants to such an extent as to serve as a measure of the correctness of the punitive damages award"); *First American Nat'l Bank of Iuka v. Mitchell,* 359 So.2d 1376, 1381 (Miss.1978) ("Absent some proper showing of the net worth or financial condition of [the defendant], we have no way to measure the correctness of the punitive damage award."). The Mississippi Supreme Court has recently explained:

> Once it is established that punitive damages in some amount should be allowed, the quantum thereof is determined by reference to certain general factors which include: (1) Such amount as is necessary for the punishment of the wrongdoing of the defendant and deterring defendant from similar conduct in the future ...; (2) Such amount as is reasonably necessary to make an example of the defendant so that others may be deterred from the commission of similar offenses ...; and (3) The pecuniary ability or financial worth of the defendant .... [T]he determination of the amount of punitive damages is a matter committed solely to the authority and discretion of the jury.

*Bankers Life and Casualty Co. v. Crenshaw,* 483 So.2d 254, 278 (Miss.1985).

■ Nevertheless, the defendants chose not to put on evidence before the jury and not to argue to the jury that they are financially imperiled, whether due to the asbestos litigation or for another reason. Notably, the only evidence on the

---

**17.** In reviewing whether the record supports punitive damages, we apply Mississippi substantive law, but a federal standard of review governed by *Boeing. See Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1374 n. 7 (5th Cir.1982) (en banc), *appeal·after remand,* 722·F.2d 1238 (5th Cir.1984), *modified and reh'g denied,* 727 F.2d 350 (5th Cir.1984); *Foster v. Ford Motor Co.,* 616 F.2d 1304, 1309 n. 10 (5th Cir.1980). We note, however, that the standard of review with respect to a jury· award of punitive damages appears to be the same under· Mississippi procedural law as under federal law. *See, e.g., West Cash & Carry Building Materials v. Palum-*

*bo,* 371 So.2d 873 (Miss.1979); *Horton v. Brooks,* 325 So.2d 912 (Miss.1976); *Blue Cross & Blue Shield of Mississippi, Inc. v. Campbell,* 466 So.2d 833 (Miss.1985). Furthermore, in reviewing punitive damage awards, the Mississippi Supreme Court, which has "expressed a great reluctance" to interfere with "punitive damages assessment[s] made by a jury," inquires into "whether the proof is sufficient to sustain an assessment of punitive damages." *Gardner v. Jones,* 464 So.2d 1144, 1150 n. 5 (Miss.1985).

**18.** *See supra* note 12.

defendants' financial condition was introduced by the plaintiff. This evidence, introduced by way of the companies' annual reports, could easily be interpreted to show that both JM and Raybestos are relatively healthy companies. *See* Plaintiff's Exhibit P–1232; 55 Record at 2295–96. The evidence showed that in 1980, JM had a net worth of over $2.3 billion and net earnings of over $80 million, and Raybestos had a net worth of nearly $50 million. *Id.* This evidence was uncontroverted. At no time did the defendants claim that the plaintiff's evidence exaggerated their financial worth, or that the evidence failed to reflect the impact that the asbestos litigation may have on their worth. They elected to let the opportunity to introduce evidence on their financial condition pass by. The defendants may be correct that the fact that this case is one of thousands should have some impact on the punitive damages awarded against them, but that is an argument which should have been made to the jury, the body responsible for assessing punitive damages in the first instance. Therefore, the only evidence on the defendants' financial condition that we may consider in our *Boeing* analysis is that introduced by the plaintiff. Under these circumstances, the punitive damage award against the defendants was not unreasonable in light of the net worth of the defendants.

We note briefly that JM's strategy during closing argument was to insist that "we did [not do] anything wrong," 55 Record at 2386, rather than to contend that punitive damages were inappropriate because of its asserted financial difficulties. JM argued that "for more than a hundred years, [JM has been] a responsible member of the business community." *Id.* at 2397; *see generally* 55 Record at 2365–2397. The strategy of Raybestos mirrored that of JM. Although counsel for Raybestos stated during closing argument that in 1980 Raybestos "lost more than six million dollars," the strategy was not to portray Raybestos as an ailing company, but as a model corporate citizen: a company which "spent mil-lions, and millions, and millions of dollars in working [on] safety." 55 Record at 2356. Raybestos asked the jury to let Jackson know "that here in Mississippi we don't punish individuals and companies who are good citizens and who have contributed to our safety and well-being." *Id.; see generally* 55 Record at 2334–2357.

The jury rejected the defendants' arguments, and found that Jackson met his burden of introducing evidence that the defendants' misconduct was so egregious that punitive damages should be assessed against them. The question for the district court at that point was solely whether the facts of the case justified the verdict under the standard set forth in *Boeing*. On the record in this case, the defendants have not shown that the punitive damage award should be set aside by way of a judgment notwithstanding the verdict or an order for a new trial. *Boeing*, 411 F.2d at 374–75.

## III. COMPENSABLE INJURIES.

In *Jackson II*, this court, applying Mississippi law, determined that under Fed.R. Evid. 401, evidence concerning the likelihood of Jackson's developing cancer was relevant—and hence admissible—with respect to whether the defendants had a duty to warn. *Jackson II*, 750 F.2d at 1320. "In establishing the scope of a manufacturer's duty to warn, therefore, evidence of all known or foreseeable hazards posed by the product is relevant." *Id.* Jackson introduced so much cancer evidence, however, that we further indicated that the amount of evidence introduced could be justified only if Jackson had available to him, as a matter of Mississippi law, compensatory damages for (1) reasonable mental anguish resulting from his increased risk of cancer, or (2) the reasonable probability of his acquiring cancer. As we stated in *Jackson II*, "[w]e think that *either* ground would justify the inclusion of the evidence in this case, provided, of course, that the damages of which the cancer evidence would be probative were available to Jackson as a mat-

ter of law." *Id.* at 1321 (emphasis added).[19] Whether Jackson was entitled to these damages were issues we certified to the Mississippi Supreme Court. We continued: "If the Mississippi Supreme Court holds that Jackson has no right in the instant case to recover damages either for cancer as a probable future consequence or for mental anguish for the fear of contracting cancer, then the cancer evidence was wrongly admitted and a new trial will be in order. If, however, the Mississippi Supreme Court rules that either category of damages is recoverable, the cancer evidence was properly admitted."[20] *Id.* After carefully reviewing the Mississippi law, we are of the opinion that Jackson is entitled to recover upon both grounds.

### A. Recovery for Cancer.

All parties concede that Jackson does not presently have cancer. The defendants argue that if Jackson does get cancer, he will be able to sue for compensatory damages associated with cancer at that time—that is, once the disease manifests itself. Jackson maintains that recovery is appropriate now since the potential development of cancer represents a future injury based on a presently existing cause of action. Relatedly, Jackson also argues that he *must* recover for cancer now or else the claim will be barred by the statute of limitations. Jackson's position is that claim-splitting is disallowed in Mississippi and that the claim for cancer, insofar as it grows out of the same actionable tort which provides his recovery for asbestosis, must be raised now. Jackson reasons that, since the claim for cancer grows out of a single actionable tort, the statute of limitations with respect to cancer begins to run from the time the tort is actionable, that is, from the time asbestosis became manifest.

The defendants assert that claim-splitting is permitted in Mississippi when that would serve the ends of justice and fairness. In any case, the defendants insist, Mississippi would adopt the discovery rule with respect to asbestos-related injuries, with the result that the statute of limitations for cancer would not begin to run until cancer actually appears. The development of cancer would be a separate tort from the development of asbestosis. As a result, defendants conclude, recovery for cancer is neither permitted nor required at this time.

The debate between the parties pivots on a single question, namely: What is the cause of action on which Jackson seeks recovery? The defendants contend that the existing cause of action is the existence of asbestosis. Jackson's position is that his cause of action is the inhalation of asbestos fibers "and the invasion of his body by those fibers, thus causing ... physical

**19.** The jury, of course, did not compartmentalize the award in this way; it simply returned a lump sum for compensatory damages and another for punitive damages. Ordinarily, "[o]ur proper review of such a verdict is not to parse the award into its various components, but to determine whether the award as a whole is within the universe of possible awards which are supported by the evidence." *Clark v. Taylor,* 710 F.2d 4, 13 (1st Cir.1983); *see also Narcisse v. Illinois Central Gulf R.R. Co.,* 620 F.2d 544, 547 (5th Cir.1980).

**20.** Footnote 12 to our opinion in *Jackson II* elaborated as to why in this case an affirmative answer to *either* question would justify the evidence.

We recognize that, if the Mississippi Supreme Court rules that damages for mental anguish are recoverable in this context, but that damages for cancer as a probable future consequence are not, then it could be claimed that the type and quantity of cancer evidence in this case continues to pose too great a risk of unfair prejudice. This distinction between these grounds for admissibility of the cancer evidence would require a different balancing analysis under rule 403. Because the defendants took an all-or-nothing position at trial with respect to the cancer evidence and have maintained this position on appeal, we do not address this issue. Clearly, if the evidence was admissible as to one kind of damages, but not as to the other, a limiting instruction would have been in order upon request. No request for such an instruction was made in this case.

750 F.2d at 1321 n. 12. We did not and do not decide the question whether, under circumstances different from those that obtain here, evidence on cancer in the quantity offered here would be admissible if directed only to recovery for mental anguish.

damage." *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1137 (5th Cir.1985). Although the statute of limitations question is concededly not dispositive of the issue of which injury provides the cause of action, the defendants' position is that if the statute of limitations would not begin to run until Jackson discovers cancer, then he should not be allowed to recover until that time: until cancer appears. Essentially, the defendants' position is that insofar as Jackson *may* bring suit for cancer at some later date, he should be required to wait until that date.

The defendants' argument must be rejected for two separate but related reasons. First, the truth of their crucial premise is not clear under Mississippi law. It is unclear whether Jackson *would* be permitted to sue to recover damages for cancer whenever cancer appears. Second, it *is* clear that under Mississippi tort law, plaintiffs may recover for probable future consequences.

In *Dunaway v. W.H. Hopper & Associates, Inc.*, 422 So.2d 749 (Miss.1982), the Mississippi Supreme Court reiterated that when four conditions are met, the plaintiff will not later be permitted to litigate, "on the same cause of action ... grounds for ... recovery that were available" in the first action "regardless of whether they were asserted or determined in the prior proceeding." *Id.* at 751 (citing cases). The four identities which trigger the res judicata bar are: "(1) identity of the subject matter of the action, (2) identity of the cause of action, (3) identity of the parties to the cause of action, and (4) identity of the quality or character of a person against whom the claim is made." *Id.; see also Wright v. Mayor and Comm'rs of City of Jackson*, 421 So.2d 1219 (Miss.1982). The

key issue, of course, involves the second identity: how to characterize the present cause of action. In *Estate of Kidd v. Kidd*, 435 So.2d 632, 635 (Miss.1983), the Mississippi Supreme Court explained that "[a] cause of action accrues ... when it comes into existence as an enforceable claim; that is, when the right to sue becomes vested." Even though events which develop subsequent to the accrual of the cause of action may affect the quantum of damages to which the plaintiff is entitled, such subsequent developments do not alter the fact that the cause of action accrued once the right to sue became vested. *See, e.g., Forman v. Mississippi Publishers Corp.*, 195 Miss. 90, 14 So.2d 344, 346 (1943).

We do suspect that under some circumstances Mississippi would adopt the discovery rule in the context of a latent disease case so as to protect a plaintiff who, through no fault of his own, discovers only belatedly that he is diseased. *See, e.g., Wilder v. St. Joseph Hospital*, 225 Miss. 42, 82 So.2d 651, 653 (1955) (significant date is when plaintiff, "in the exercise of ordinary care, should have discovered" her injury). It would seem grossly unjust for the statute of limitations to begin to run before *any* disease is discovered. Similarly, the defendants may be correct that a plaintiff who later develops cancer may be able to recover at that time if an earlier jury, dealing with some other manifestation of asbestos exposure, concludes that the plaintiff does not presently have a reasonable probability of developing cancer. But these hypotheticals are not our case. Jackson established that he will probably get cancer. In addition, he has already discovered, and brought suit to recover for, his asbestosis.[21] Under these circumstances, it

---

21. We note here something of a tension in the defendants' position. On one hand, they attempt to project an image of impending financial destruction; on the other, they ask us to refuse to permit Jackson to recover for the likelihood of developing cancer. Thus, if we were to believe the defendants' portent of doom, we should be loathe to tell Jackson that he cannot recover for cancer until later on—for if

the defendants are correct, there may well be no money available later on.

We also note that arguably, the statute of limitations *does* begin to run for all injuries once some disease is manifest. *See, e.g., Martin v. Johns-Manville Corp.*, 322 Pa.Super. 348, 469 A.2d 655 (1983) (where "present injury" was asbestosis, plaintiff was also *required* to recover for risk of cancer), *vacated on other grounds,*

is clear that under Mississippi law Jackson may recover cancer damages. Further, having recovered cancer damages, he cannot later recover more if and when he develops cancer.

"The general rule is that where it is established that future consequences from an injury to a person will ensue, recovery therefor may be had, but such future consequences must be established in terms of reasonable probabilities." *Entex, Inc. v. Rasberry*, 355 So.2d 1102, 1104 (Miss.1978). Defendants respond that cancer does not develop *from* asbestosis, that it can never be a future consequence *of* asbestosis. Cancer is presumably a separate injury, and recovery must therefore await manifestation. This assertion is medically sound, but legally awry. In a sense, the injury in this case is the inhalation of asbestos fibers. It was not an *actionable* injury, however, meaning it was not legally cognizable, until at least one evil *effect* of the inhalation became manifest. There was no cause of action at all, in other words, until the asbestosis appeared. In this case, the effects of inhaling asbestos manifested themselves initially as asbestosis. In a different plaintiff, they may have manifested themselves as something as in-

nocuous as asbestos callouses or as lethal as mesothelioma. But in any event, once the injury becomes actionable—once *some* effect appears—then the plaintiff is permitted to recover for all probable future manifestations as well.[22]

In *General Motors Acceptance Corp. v. Layton*, 353 So.2d 749 (Miss.1977), a plaintiff involved in an automobile accident sued to recover compensatory damages for injuries sustained in the collision. At the time of trial, the plaintiff was suffering only from a bruised knee. An expert witness testified that persons with knee injuries, such as the plaintiff, " 'are more likely to develop arthritis in joints....' " *Id.* at 753. The expert witness' testimony with respect to the increased likelihood of the plaintiff's developing arthritis in the bruised knee was sufficient to permit the plaintiff to recover compensatory damages for the reasonable probability of developing arthritis. It was not that the arthritis would develop *from* the bruise; it was rather that it would result from an injury which had manifested itself, at the time of trial, by a bruised knee. *Layton* is indistinguishable as a matter of tort law from this case. Jackson may recover for the medical probability of developing cancer.[23]

---

494 A.2d 1088 (Pa.1985); *cf. Bendix Corp. v. Stagg*, 486 A.2d 1150, 1152–53 (Del.1984). This is an issue which we need not decide, however. For present purposes, the fact that recovery for probable future injuries is *permissible* is sufficient to sustain this award.

**22.** Defendants' reference to language in *Schweitzer v. Consolidated Rail Corp., (Conrail)*, 758 F.2d 936 (3d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), is inapt. There, the Third Circuit explained that although "the possible existence of subclinical asbestos-related injury may be of interest to a histologist ...[,] subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage ... required to sustain a cause of action under generally applicable principles of tort law." 758 F.2d at 942. We tend to agree. Nevertheless, *Schweitzer* is obviously not this case. Here we have Jackson, whose injuries are far from being merely subclinical.

**23.** Despite the clear applicability of *Layton*, the defendants have cited enough slightly off-point cases that we are compelled to say what this case is not. It is not an asbestos suit where a

plaintiff with cancer who never sought to recover for asbestosis or any other asbestos-related injury but who did in fact *have* another asbestos-related injury comes before us seeking some recovery. The present case is therefore unlike those where a cancer victim who had not brought suit upon manifestation of another earlier-developing injury later attempts to get *something* once cancer appears. *See, e.g., Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 464 A.2d 1020 (1983); *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111 (D.C.Cir.1982). In *Wilson*, for example, the D.C. Circuit rejected JM's claim that "once some harm is apparent, a claim accrues not only for harm then manifest, but for all harm that may eventuate in the future as a result of the same conduct." 684 F.2d at 117. In *Wilson*, the victim of asbestosis never brought suit; his widow did after the victim died of asbestos-related mesothelioma. The D.C. Circuit permitted the widow's suit but explicitly noted that "we need not and do not decide whether Johns-Manville's initial premise is correct, i.e., whether judgment on a claim for asbestosis ... would have precluded a subsequent claim based on the ... mesothelioma diagnosis. It suffices to point out that res judi-

Of course, a plaintiff who sues with nothing more than hand callouses may have a significantly lower likelihood of developing cancer than does a plaintiff who exhibits asbestosis. That would be a question for the jury, to be decided by listening to and evaluating conflicting medical testimony. This plaintiff, however, has asbestosis; and evidence adduced at trial indicates that he has a greater than fifty percent chance of getting cancer.[24] Recovery for that possibility is permissible under Mississippi law.

### B. Fear.

Jackson also maintains that the cancer evidence introduced at trial was relevant insofar as it elucidates the basis of the mental distress he has suffered due to the knowledge that he will probably get cancer.[25] The defendants repeat their earlier argument: that "since there is no evidence that cancer 'develops from' asbestosis there can be no recovery for fear of an injury which has not occurred, and does not 'develop from' *any of Jackson's presently existing injuries.*" JM's brief at 25 (emphasis in original). But the crux of JM's argument, once again, is that these compensatory damages should not be awarded because so many people have been injured:

The most compelling reason which supports rejection of claims for risk of future and separate diseases and fear of future and as yet undeveloped diseases, is that in the context of mass tort suits where latent diseases may develop from exposures which occurred ten, twenty or even forty years ago, the possible litigation is on a scale of such unprecedented magnitude that it is likely to exceed the resources not only of the defendants, but of the judicial system and society generally. *For this reason alone, recovery should be limited to present injuries.*

JM's brief at 27 (emphasis added).

It is thus quite clear that the defendants are asking this court to change the rules in Mississippi in the case of a mass tort. However, without repeating our earlier views concerning the defendants' argument that the magnitude of its wrong should circumscribe the damages awarded against it, we note simply that the defendants have pointed to no Mississippi authority which supports their radical proposal. Our role is to apply current Mississippi law, and under current law, Jackson's fear, which is a present injury, is compensable. *See, e.g., Occhipinti v. Rheem Manufacturing Co.,* 252 Miss. 172, 172 So.2d 186 (1965).

cata (claim preclusion) doctrine and policy would control the decision on that question." 684 F.2d at 117.

Our case is different. Since Jackson has already sued to recover for asbestosis, it is enough for our purposes that Mississippi law clearly authorizes recovery for future injuries where such injuries are established in terms of reasonable probabilities.

To the extent that the defendants are arguing that we should disregard *Layton* and ignore the applicable Mississippi law because of the fact that this case ostensibly involves a mass tort, we note that the defendants' argument is unsupported by any Mississippi authority. We apply existing principles of Mississippi tort law, and *Layton* evinces one such principle unmistakably.

24. There can be little doubt that the jury had ample evidence upon which it could have based its conclusion that Jackson will probably get cancer. According to Dr. James Merchant, "it's been shown conclusively that [asbestos] is a cause of cancer in human beings." 52 Record

at 1362. Furthermore, according to Dr. Merchant, "between 40 and 60 percent of those with asbestosis who have had previous heavy exposure die from bronchogenic carcinoma [lung cancer]." 52 Record at 1362. (According to Dr. Lewinsohn, the figure is 50 to 60 percent. *Id.*) Dr. Elliot McCaughey testified too that Jackson has a greater than 50 percent likelihood of developing an asbestos related cancer. 48 Record at 125. For more evidence in the record concerning the relationship between asbestos and asbestosis and cancer, *see, e.g.,* the testimony of Dr. Gerrit Schepers, 49 Record at 385–498, esp. 415–19 and 564–65; the testimony of Dr. David Ozonoff, 51 Record at 1084; and the testimony of Dr. Nicholas Demy, 51 Record at 1130–38, 1155.

25. There was considerable testimony before the jury to the effect that Jackson will probably develop cancer; it is in that context that we discuss damages for mental anguish. We do not consider whether a plaintiff who cannot show that he will probably develop cancer may recover for mental distress.

Jackson's fear is plainly a present injury. It is a fear which he experiences every day and every night. It is fear which is exacerbated each time he learns that another victim of asbestos has died of lung cancer.[26] It is fear which, regardless of whether Jackson actually gets cancer, will haunt him for the rest of his life. Jackson's claim is not merely that he *might* get cancer, or that there is a remote possibility that he will. Jackson has established that there is a greater than fifty percent chance that he *will* get cancer. Who can gainsay that this knowledge causes him anguish, or that this anguish is reasonable? Certainly not this court and, in our view, not the Mississippi Supreme Court.[27]

Under Mississippi law, damage awards for mental distress may be rendered when either of two conditions is satisfied: when the plaintiff's mental suffering is accompanied by a physical injury, or when the plaintiff establishes the defendant's misconduct to have been wilful, gross, or wanton. In *Daniels v. Adkins Protective Service, Inc.*, 247 So.2d 710, 711 (Miss.1971), the Mississippi Supreme Court stated the general rule: "[T]here can be no recovery for mental pain and suffering from the mere negligent act of another unaccompanied by physical or bodily injury. However, damages are recoverable for mental pain and anguish by a wilful, wanton, malicious, or intentional wrong even though no bodily injury was sustained" (citing cases) (emphasis omitted). Summarizing Mississippi law, a federal district court explained that "[t]he Mississippi Supreme Court, on many occasions, has considered the award of damages for mental pain and suffering not accompanied by distinct physical injuries, and has adopted the rule that such are

allowable when occasioned by a wilful, wanton, intentional, or malicious wrong." *Johnson v. Ford Motor Co.*, 354 F.Supp. 645, 648 (N.D.Miss.1973). *Accord, Sears, Roebuck & Co. v. Young*, 384 So.2d 69 (Miss.1980); *see also McCulloch v. Glasgow*, 620 F.2d 47, 51 (5th Cir.1980) (applying Mississippi law). We think it beyond cavil that in such a case as is before us, where the plaintiff manifests a present injury and has also succeeded in demonstrating gross misconduct, compensatory damages for mental distress are recoverable.

The record in this case supports either ground of recovery. In Part II, *supra*, we adverted to the jury's ostensible conclusion in awarding punitive damages that the defendants' conduct had been egregious. That same predicate justifies an award for injuries arising out of mental distress. In addition, Jackson's distress is accompanied by a present *physical* injury: He has asbestosis.

For us to rule that this case should be an exception to what is clearly the law of Mississippi would be to intrude upon the prerogative of the Mississippi courts, and it would be to do so without any indication whatsoever from the Mississippi courts that such an intrusion is welcome or that such an outcome is desired. Furthermore, we are aware that other jurisdictions have addressed this issue, and as recent commentators have noted, "[c]ourts having considered cancerphobia ["the present anxiety over developing cancer in the future"] almost uniformly have allowed it. The few courts not allowing recovery have done so on the basis of a lack of physical injury, the unreasonableness of the fear under specific facts, or because the fear was claimed by a wife due to the observation of the injuries

---

26. For testimony concerning deaths due to asbestos exposure, see the testimony of Dr. Schepers, 49 Record at 415, 442, 449.

27. Defendants' make much of the fact that Jackson did not specifically state that he suffers mental distress. However, the jury could have concluded, after hearing the medical testimony, that the likelihood that Jackson will get cancer causes him anguish. In addition, the district court's charge clearly instructed the jury that in

setting damages, the jurors should take into account (among other things) "[a]ll physical pain and mental anguish suffered by [Jackson] to date and such as he is reasonably certain to suffer in the future as a direct result of his complained of condition." 56 Record at 2444. Finally, counsel for JM acknowledged in his closing argument that Jackson testified that "he is fearful of a cancerous condition at some time in the future." 55 Record at 2369.

to her husband. Notably, this minority has not based its decision on the noncompensability of cancerphobia." Gale & Goyer, *Recovery for Cancerphobia and Increased Risk of Cancer*, 15 Cumberland L.Rev. 723, 730–31 (1985).[28] Current Mississippi tort law permits recovery for the injury of mental distress, and we have no reason to believe that the rule would be altered in this case.

## IV. CONCLUSION.

In brief response to the dissent, we reaffirm the position taken in *Jackson II* that Congress' silence in the face of a desparate need for federal legislation in the field of asbestos litigation does not authorize the federal judiciary to assume for itself the responsibility for formulating what essentially are legislative solutions. Displacement of state law is primarily a decision for Congress, and Congress has yet to act.

Following the Mississippi Supreme Court's decision to decline certification of the issues presented on this appeal, our procedure has been to apply existing Mississippi tort law to the facts of this case. Having studied Mississippi tort law, as well as decisions of other jurisdictions in cases such as this one, we conclude that the fact that this case involves a claim of strict liability and that it grows out of a mass tort would not incline the Mississippi Supreme Court to treat it differently from other torts, especially those where the jury has found that the defendants' conduct was wanton, reckless, or grossly indifferent to the rights of others. We therefore conclude that under Mississippi law, Jackson is entitled to punitive damages, and to compensatory damages for the reasonable probability of getting cancer and for the present fear that he will get cancer in the future. Accordingly, the judgment of the district court is AFFIRMED.

**28.** Significantly, virtually every case cited by the defendants for the proposition that damages for mental distress would not be recoverable fall into the third category of exceptions noted by Gale & Goyer; that is, virtually all involved attempts by the spouse to recover compensation for mental distress where the physical injury

CLARK, Chief Judge, with whom GEE, GARZA, POLITZ, and JOLLY, Circuit Judges, join, dissenting:

The learned, lengthy opinion of the majority is the wrong response by the wrong court.

The *wrong response* sprang from several sources. First, looking backward to the signposts of *stare decisis* has turned the court away from the road to justice because this case exceeds the limits of ordinary case and controversy litigation in our complex, interrelated society. Second, the court responds to innovative lawyers pressing for immediate financial recovery for individual clients (and themselves). We do not fault the lawyers. That counsel wish to continue the present mode of case-by-case adjudication is all too understandable. The nature of their professional concern must, under the canons of ethics, run only to their present clients. They are not required to anticipate the impact of today's judgment on the host of tomorrow's claimants they do not represent but who deserve to share in the finite proceeds which a limited group of defendants can provide to compensate mass tort victims.

Third, the court is frustrated by lack of congressional action. A number of legislative solutions has been proposed for the problems we must confront today and tomorrow throughout America because of yesterday's production and use of asbestos. None has been enacted. Clearly the powers of Congress to tax and regulate give that forum the interstate reach and flexibility needed to allocate the relatively scarce resources that must be available to present and future claimants to achieve the greatest good for society.[1] Yet, Congress can refuse to act while the court cannot abstain from resolving a case presented.

was suffered by the other spouse. *See, e.g.,* JM's brief at 12.

**1.** Pneumoconiosis, black lung disease, in coal mines cried out for a national legislative response; it received one. 30 U.S.C. § 901 *et seq.* Asbestos disease speaks with a louder voice.

Fourth, the majority's response is directly affected by the question perceived. This seminal case concerns much more than James Leroy Jackson's individual claim against some companies that may have furnished an unsafe product to a shipyard in which he worked. We know better.

Our dockets tell us so—dockets in the Southern District of Mississippi, dockets in the Eastern District of Texas, dockets in the Eastern District of Louisiana, dockets in the Southern District of Texas, dockets throughout the state and federal courts across this nation. Tens of thousands of similarly situated claimants are already seeking relief against the same defendants, and a legion of other potential plaintiffs stand in the wings, awaiting the predictable manifestations of their identical exposure. Other public and private plaintiffs seek recovery from the same defendants for costs incurred in removing asbestos materials from structures in every area of the country.[2]

The United States as amicus curiae tells us so—by the very act of filing a brief in this "private" action as well as by the facts they furnish on present claimants, past expenditures and predicted future deaths and injuries related to asbestos exposure.

Finally, the court fails to take into account that what we say here creates new precedent. We are not passing a milepost along a known path leading to a chosen goal. Instead, the court, without a goal, chooses a new path which will compel the way of all litigants who come later. Given this situation, the proper judicial response should be one based on a broad view of the whole question.

The *wrong court* gives this wrong response. We do not say this because the majority opinion is structured as a prediction of what the Mississippi Supreme Court would decide about the novel issues fixed in our jurisprudence by today's decision. We say so because a national problem has been adjudicated as though it were a state problem after the concerned state court wisely refused to accept our certification of the issues to it.

Sadly the majority chose to certify these issues to that court rather than to the Supreme Court of the United States. The United States Supreme Court could have given us proper responses. More's the pity that the majority reads nothing into the Mississippi Supreme Court's refusal. We who dissent do not believe that the Mississippi Supreme Court simply arbitrarily declined to answer the questions posed. Such a belief would attribute to them a failure to perform an important judicial function. The more plausible reasons are that the views of the only two Mississippi judges of our court were considered correct or that

---

**2.** Numerous texts and articles define the dimensions of asbestos litigation, litigation costs, and the resulting fiscal problems created for plaintiffs and defendants. *See, e.g.,* Hensler, Felstiner, Selvin, Ebener, *Asbestos in the Courts: The Challenge of Mass Toxic Torts* (The Institute for Civil Justice, Rand Corp. 1985); The Institute for Civil Justice, *An Overview of the First Five Program Years* (1985); Kakalik, Ebener, Felstiner, Haggstrom & Shanley, *Costs of Asbestos Litigation* (The Institute for Civil Justice, Rand Corp. 1984); Kakalik, Ebener, Felstiner, Haggstrom & Shanley, *Variation in Asbestos Litigation, Compensation and Expenses* (The Institute for Civil Justice, Rand Corp. 1984); T. Willging, *Asbestos Case Management: Pretrial and Trial Procedures* (Federal Judicial Center 1985); Harris, *Asbestos Chapter 11 "Solution" to the Tort Litigation System in Recent Developments in Tort Law Reform, 39 The Business Lawyer* 209 (Johnson ed. Nov. 1983); Locks, *Asbestos-Related Disease Litigation: Can the Beast Be Tamed?* 28 Vill.L.Rev. 1184 (1983); Markaron, *The Inapplicability or Reduction of Punitive Damages in Asbestos Litigation,* Industrywide Litigation, Defense of Asbestos Lawsuits, DRI 81–1; Phillips, *Asbestos Litigation: the Test of the Tort System* 36 Ark.L.Rev. 343 (1983); Special Project, *An Analysis of the Legal, Social and Political Issues Raised by the Asbestos Litigation,* 36 Vand.L.Rev. 573 (1983); Comment, *An Examination of Recurring Issues in Asbestos Litigation* 46 Alb.L.Rev. 1307 (1982); Comment, *Asbestos Litigation: The Dust Has Yet to Settle,* 7 Fordham Urb.L.J. 55 (1978); Note, *Mass Liability and Punitive Damages Overkill,* 30 Hastings L.J. 1797 (1979); Comment, *The Asbestos Tragedy: Legal Issues and the Need for Reform,* 8 U. Dayton L.Rev. 353 (1983); Olick, *Chapter 11—A Dubious Solution to Massive Toxic Tort Liability,* 18 Forum 361 (1983); Brodeur, "Annuals of Law" (Asbestos—Parts I–IV), *The New Yorker,* (June 10, 1985–July 1, 1985).

the issues certified were not perceived to be proper, controlling issues that court could settle, or both.

We believe that the Mississippi Supreme Court thought, as we do, that if some judicial forum must respond to Jackson's plea, there is only one right court to do so—the Supreme Court of the United States. The problems we face in this litigation are ones of national public policy. To respond to such policy is beyond the ability of this diversity-based court. Such policy cannot be subject to the whims of individual states because matters of national public policy have nationwide application. Since Congress has not provided a solution, the Supreme Court of the United States should have been asked to provide one. Had that Court answered the questions previously suggested (750 F.2d at 1335), it would have afforded the only justice a judicial forum is capable of providing for this case.

Because the majority's wrong response comes from the wrong court, we respectfully dissent.