**Mrs. Thelma WILSON, Plaintiff,**

**v.**

**NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.**

**No. DC85–109–LS–O.**

United States District Court,
N.D. Mississippi,
Delta Division.

Aug. 14, 1987.

Richard T. Phillips, Smith, Phillips & Mitchell, Batesville, Miss., for plaintiff.

S.T. Rayburn, Richard C. Coker, H. Scot Spragins, Sumners, Hickman & Rayburn, Oxford, Miss., for defendant.

## MEMORANDUM OPINION

SENTER, Chief Judge.

In this diversity suit, plaintiff Thelma Wilson alleges that the Nationwide Insurance Company has improperly denied her application for insurance proceeds under the terms of her automobile liability insurance policy and Mississippi law. A bench trial was held in this cause on November 5–6, 1986. Pursuant to Rule 52(a), the court now proceeds to make the following findings of fact and conclusions of law.

### Findings of Fact

The plaintiff is a citizen of Mississippi. The defendant, Nationwide Insurance Company, is an Ohio corporation with its principal place of business in the same state.

Thelma Wilson, the plaintiff herein, is a native of Marks, Mississippi. Mrs. Wilson and her husband, Elbert, have been married over forty-six years and have three children and five grandchildren. In addition, Mrs. Wilson has three sisters, Sara Sorrells, Jessie Monroe, and Bessie Goodman. Mrs. Wilson is sixty-two years old.

Years ago, Mrs. Wilson and her husband both worked in Memphis, Tennessee. They lived in Southaven, Mississippi, located just across the state line, until 1979 when they moved to the Town of Nesbit, Mississippi, a few miles away. Both Thelma and Elbert Wilson are retired.

The Wilsons have insured their automobiles through the Nationwide Insurance Company since 1963. Initially, they transacted their insurance business through an individual named Herman McCarson, a Nationwide agent located in Southaven. In 1965, Carl and Mary Avant replaced McCarson as Nationwide's Southaven agents and assumed the Wilson account.

The Mississippi legislature in 1966 enacted the state's first Uninsured Motorist Act. Miss.Code Ann. § 83–11–101, *et seq.* (1972). Set to become effective in 1967, the Act provided a means by which victims of car accidents caused by financially irresponsible motorists could recover for their injuries. *Id.*

The Act, in conjunction with the Mississippi Motor Vehicle Safety Responsibility Law, Miss.Code Ann. § 63–15–1, *et seq.* (1972), states that no insurance policy may be issued in the state unless it provides coverage for accidents occurring between insured and uninsured motorists. *Id.* The limits of statutory coverage are set at a minimum of $10,000 per person/$20,000 per occurrence, but may be raised up to the amount of bodily injury coverage contained in the policy. *Id.*

The Act also states that an insured could reject uninsured motorist (UM) coverage completely as long as the waiver was executed in writing. Furthermore, once a written rejection has been made, the insurer is relieved of any obligation to offer the coverage each time the policy comes up for renewal. *Id.*

After Mississippi formally enacted its uninsured motorist law, insurance companies doing business in the state instructed their agents to contact policyholders and inform them of the new law. Insurance agents, including the Avants, were directed

to either obtain a UM rejection from each policyholder in writing or to recalculate the premiums due upon renewal taking into account the additional coverage to be provided.

The Avants state that they proceeded to meet with all their clients in 1966 and 1967 to discuss the new law. Although the Avants fail to remember specifically meeting with the Wilsons during this period, they are confident that such a meeting did occur and that uninsured motorist insurance coverage was explained to the Wilsons in detail.

The Wilsons admit that they met with the Avants frequently to discuss their insurance needs, but fail to recall any discussions concerning uninsured motorist insurance. The only discussions the Wilsons remember dealt with changing coverages and substituting new vehicles for those sold or traded away. Insurance records support this testimony and show that the Wilsons changed their policy on June 12, 1967, to substitute listed vehicles and to reject two types of coverage, med-pay and family protection uninsured motorist.

It is uncontested that the Wilsons were not charged an additional premium for uninsured motorist coverage in 1967. According to the standard business practices of Nationwide, a premium was charged to all policyholders for UM coverage unless a written rejection was received. Although the Avants state that they assume that such a rejection was executed, the Wilsons fail to recall taking such an action. No copy of a 1967 rejection has been produced by Nationwide, however, and the court finds that one did not exist.

The Wilsons renewed their policies in 1968 and 1969 without substantial modification. In 1970, Nationwide consolidated all policies then in force covering separate automobiles where ownership was vested in one family. The Wilsons' individual policies were combined into one policy at this time without objection.

Mrs. Wilson began to suffer acutely from fibrositis [1] in 1972 which forced her to undergo disc surgery. Mrs. Wilson subsequently retired from her job on the basis of medical disability and was successful in obtaining a permanent award of Social Security disability insurance benefits.

In 1974, the Wilsons purchased a motor home and insured it with Nationwide. The court notes this particular listing with interest, since the Wilsons specifically purchased uninsured motorist insurance protection for the vehicle.

Mississippi amended the Uninsured Motorist Act in 1979 to require insurers to provide an additional type of coverage to insureds. Under the amended Act, it was required that policyholders be offered both bodily injury and property damage uninsured motorist coverage. This requirement was subject to the qualification that any policyholder could waive such a right by executing a written form rejecting the coverage. *See* Miss.Code Ann. § 83–11–101, *et seq.* (Supp.1986).

In 1980, Nationwide directed its agents to again approach policyholders with regard to the new amendments and to obtain renewed waivers where necessary. Mrs. Wilson was one of the policyholders who executed such a waiver, which reads as follows:

UNINSURED MOTORIST COVERAGE REJECTION STATEMENT

The insurance authorities have approved an UNINSURED MOTORIST COVERAGE in your state. This coverage is not mandatory, but it is required that the coverage be offered to all policyholders. This coverage is designed to pay for injuries that could be received in accidents caused by drivers of uninsured vehicles. I do not care to have UNINSURED MOTORIST COVERAGE added to my policy at this time.
/s/

Mrs. Wilson testified that she signed the rejection statement under the mistaken impression that she was already receiving

---

**1.** Fibrositis, also called muscular rheumatism, is an inflammatory condition marked by pain and stiffness in the muscular tissues and elsewhere.

*See* Dorland's Illustrated Medical Dictionary, 24th ed., at p. 556.

uninsured motorist coverage in the amount of $25,000.00, equal to the policy limits on liability coverage, protecting her from injuries caused by uninsured motorists.

The Avants stated that they discussed uninsured motorist coverage with the Wilsons again in 1979 prior to the execution of the above-mentioned rejection statement. Mrs. Wilson remembers meeting with the Avants; she does not recall any discussions on the topic of uninsured motorist coverage.

The court assumes, without deciding at the present time, that the 1980 rejection statement is invalid.[2] Based upon the assumption that Mrs. Wilson is entitled to uninsured motorist coverage under § 83–11–103, the court makes the following additional findings.

The instant dispute centers around an automobile collision on May 27, 1983. While on their way to Memphis, Mrs. Wilson and two passengers[3] were driving north on Interstate 55 when a gravel truck sideswiped their car, causing them to lose control. A second gravel truck coming from behind then struck the vehicle and forced it off the road and onto the median. Mrs. Wilson sustained severe personal injuries, and her car was totally destroyed.

Immediately after the impact, the driver of the second truck stopped and radioed the driver of the first truck to inform him of the collisions. As the second driver went to see if he could help Mrs. Wilson, the first driver turned his truck around and returned to the scene on the south side of the highway.

The collisions occurred just north of Nesbit, Mississippi, around the exit ramp of a truck weigh station located nearby. From the testimony introduced at trial, it appears that Mrs. Wilson approached the weigh station as trucks were entering the highway. Although Mrs. Wilson moved her car over to the left lane, it was not enough to avoid being hit by the first gravel truck which sped up behind her, passed her, and scraped the entire right side of her car. As the left rear wheel of the truck came into contact with Mrs. Wilson's right fender, it hooked her car and caused it to spin across into the right hand lane. The cause of this first accident was clearly the negligence of the first truck driver; Mrs. Wilson did not contribute to the collision in any way.

The driver of the second gravel truck, Jimmy Carlini, had entered the scales behind the first truck and exited a short time thereafter. In the meantime, a slow moving McLean "Double Diamond" had pulled through the scales and was heading onto the highway ahead of Carlini's truck. As Carlini pulled onto the highway, Mrs. Wilson's car shot in front of him (as a result of the collision with the first gravel truck), forcing him to swerve to the right in an attempt to avoid a collision. Carlini was unsuccessful and upon impact, Mrs. Wilson's car was forced across the left lane onto the grass in the median.

The key issue is whether Jimmy Carlini was negligent in the operation of his vehicle. Carlini testified that he glanced over his left shoulder before entering the highway to make sure the right lane was clear of traffic. This is understandable, since trucks were required to merge with the northbound traffic, as opposed to local access road entrances where vehicles must stop or yield before entering the highway. Carlini admits that he failed to look in front of him at this point, but asserts that his vision was only momentarily averted.

**2.** Mississippi law provides that only the "named insured" may execute a· written rejection of UM coverage. Miss.Code Ann. § 83–11–101 (1986). Mr. Wilson, the only insured named in the policy, did not sign the form although he authorized his wife to sign the form and conduct insurance dealings on his behalf generally.

Prior to trial, the court was urged to hold the rejection invalid because, *inter alia,* a) it was signed by the wrong individual, b) it was signed with the policy number blank, c) it contained an incorrect statement of Mississippi's law on unin-sured motorist insurance coverage, and d) Nationwide failed to explain the coverage available under the law and the effect of rejecting the same to Mrs. Wilson before she signed the form. In view of the court's eventual ruling, a discussion of these issues, which largely involve matters heretofore unaddressed by the courts of this state, is unnecessary.

**3.** The two passengers were plaintiff's sister, Sara Sorrells, and her sister's grandchild, Mandy.

The court is of the opinion that Carlini maintained a reasonable lookout under the circumstances. A driver must continually shift his vision to all areas of the road while driving. Carlini's avoidance of a collision with other cars may have contributed to his accident with Mrs. Wilson, but this fails to support a finding of negligence.

Carlini also testified that he smokes and may have had a cigarette lit when entering the highway. The act of smoking is insufficient to establish negligence *per se*, however, and absent any evidence tending to show that smoking interfered with Carlini's ability to drive, the court finds that this is inadequate upon which to base a finding of negligence.

Finally, plaintiff asserts that Carlini was guilty of negligence because he failed to maintain a safe distance between his truck and either the McLean truck or the first gravel truck. Mrs. Wilson testified that she did not see the gravel trucks enter the highway, but was aware of being hit by the second truck a "split second" after the first collision. One of the passengers in the car, Sara Sorrells, confirmed this and added that she had observed the two gravel trucks "tail-gating" each other as they left the scales.

Carlini testified that he was between 200 and 400 feet behind the truck in front of him. He also stated that this would be roughly three to five truck lengths in distance. If a 40-foot truck is used as a standard measure, the latter statement indicates that Carlini was about 120–200 feet away from the lead vehicle.

Mississippi law technically requires a truck to maintain a minimum of 300 feet between itself and other vehicles. Miss. Code Ann. § 63–3–619 (1972). In the state drivers manual, the drivers are admonished to stay far enough behind a truck to enable them to clearly see the road ahead. Ultimately, however, the optical distance which should be maintained between vehicles depends on a number of factors such as speed, visibility, road conditions, and the number of vehicles on the road.

The collisions occurred on Friday, May 27, 1983, at 11:30 a.m. Visibility was excellent, and the road surface was dry. Traffic congestion on the interstate was generally light, but was heavier around the weigh scales due to the influx of trucks coming onto the highway. Vehicles were traveling 55 miles per hour and faster.

Although there is some evidence to support a finding that Carlini was negligent, the court finds the contrary position to be more credible. Under the circumstances outlined above,[4] Carlini was unable to avoid hitting Mrs. Wilson and was not negligent in the operation of his vehicle on May 27, 1983.

After the collisions, Mrs. Wilson was taken to the hospital. Medical experts stated that she had suffered a broken collarbone, several contusions, and was generally shaken up. Subjective symptoms of pain manifested themselves a short time later and continued to plague Mrs. Wilson in the following weeks. It is undisputed that Mrs. Wilson continues to be partially impaired as a result of her injury. Mrs. Wilson has incurred medical expenses in excess of three thousand dollars.

Mrs. Wilson initially brought suit against the drivers of the two trucks and received $20,000.00 in exchange for the settlement of her claims. Mr. Wilson, who had suffered loss of companionship as a result of his wife's injuries, received $100.00 in the above-mentioned settlement. The two drivers were covered by one fleet policy, and the amounts received by the Wilsons were paid by the drivers' liability carrier, the United States Fidelity and Guaranty Insurance Company (USF & G). It is alleged that Mrs. Wilson remains partially uncompensated for the injuries inflicted on May 27, 1983.

The USF & G policy provided $25,000.00 coverage for each accident. By construing the May 17, 1983, collisions as two accidents, the company was able to justify a

---

4. Photographs taken at the scene of the accident show skid marks appearing toward the end of the weigh station exit lane and veering off the road onto the right shoulder. This supports Carlini's statement that he attempted to avoid Mrs. Wilson by swerving his truck to the right.

payment totaling $50,000.00. Mrs. Wilson and her husband received $20,100.00 under the USF & G policy, while Mrs. Sorrells and her husband received $25,702.00.[5] Actions which had been filed in state court were dismissed upon receipt of these funds. *See Wilson v. Cosby*, No. 5748 (Cir.Ct.Panola Cty., Miss.1984); *Sorrells v. Cosby*, No. 5886 (Cir.Ct.Panola Cty., Miss.1984).

Mrs. Wilson then proceeded to submit a claim to her insurer, the Nationwide Insurance Company. Nationwide denied that Mrs. Wilson was entitled to any benefits, and the instant suit was commenced on March 7, 1985, to resolve the dispute.

At the close of the plaintiff's case, the court rendered judgment in favor of Nationwide as to the issue of punitive and extracontractual damages. The only issue remaining in the case is for the court to determine the amount of compensatory damages, if any, the plaintiff is entitled to recover.

### Conclusions of Law

The court is vested with subject-matter jurisdiction over the instant controversy, there being complete diversity between the parties and an amount in controversy in excess of ten thousand dollars. 28 U.S.C. § 1332, 1441. Mississippi law controls the disposition of all legal issues. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Uninsured motorist insurance is available primarily in two situations. First, if the insured is involved in an accident where the tortfeasor has no insurance, then the insured is guaranteed uninsured motorist coverage benefits amounting to his uninsured motorist insurance policy limits or to the statutory minimum of $10,000 per person/$20,000 per occurrence, whichever

is greater. Miss.Code Ann. § 83–11–101, *et seq.* (Supp.1986). Second, if the tortfeasor's liability insurance limits are less than the insured's uninsured motorist coverage limits, he is referred to as "underinsured," and the insured is again provided coverage up to either the limits of his own policy or to the statutory minimum, whichever is greater. Miss.Code Ann. § 83–11–103(c). An insured is entitled to uninsured and underinsured motorist coverage unless he has executed a rejection of such coverage in writing. Miss.Code Ann. § 83–11–101 (Supp.1986).

In the case *sub judice*, the two truck drivers were covered by the USF & G insurance policy. Mrs. Wilson may recover only if she is able to show 1) that the coverage provided by Mississippi's UM statute is greater than that which she received from the tortfeasors' liability carrier, 2) that she is legally entitled to collect damages from the negligent motorist(s), and 3) that she sustained personal injuries or property damage as a result of being struck by another vehicle. Since the parties agree that the last requirement has been met, the court will proceed to consider the first two.

#### A. Underinsured Motorist Coverage.

Section 83–11–101, *et seq.* (Supp.1986) provides that all policies issued in the state are automatically required to provide a minimum of $10,000.00 in uninsured motorist coverage to the insured to compensate for injuries sustained in accidents with uninsured or underinsured motorists. If separate premiums are paid for separate vehicles, the coverage provided for each vehicle may be "stacked" when calculating the total amount of UM coverage available under the law.[6] *Pearthree v. Hartford Accident and Indem. Co.*, 373 So.2d 267

---

5. Nationwide, which was subrogated to Mrs. Wilson's property damage claim, received repayment of the property damage loss in the amount of $3,598.00.

6. If an insurance policy limits liability in unambiguous terms, it may prevent stacking of coverages under Mississippi law. *Blansett v. American Employers Ins. Co.*, 652 F.2d 535 (5th Cir. 1981); *Hartford Accident and Indemnity Co. v.*

*Bridges, supra.* Language similar to that contained in the "limits of liability" clause in Nationwide's policy has already been declared ambiguous by Mississippi courts, however, and is therefore insufficient to avoid stacking in the case *sub judice. See Pearthree v. Hartford Accident and Indem. Co., supra* 373 So.2d 267 at 269; *Hartford Accident and Indemnity Co., supra,* 350 So.2d at 1381.

(Miss.1979); *Hartford Accident & Indemnity Co. v. Bridges*, 350 So.2d 1379 (Miss. 1977); *Southern Farm Bureau Casualty Ins. Co. v. Roberts*, 323 So.2d 536 (Miss. 1975).

The Wilsons had two vehicles listed on their policy. They paid separate premiums for each vehicle. If they did not effectively reject coverage in 1967 or 1979, they are entitled to stack the statutory minimum amount of coverage to provide a total aggregate of $20,000.00 of coverage per accident. Since two accidents occurred, Mrs. Wilson is entitled to $40,000.00 in coverage under Mississippi's UM statute.

The USF & G policy provided for liability coverage in the amount of $25,000.00 per occurrence, or $50,000.00 in the instant case. This amount exceeds the statutory minimum set out in the Motor Vehicle Responsibility Act. Miss.Code Ann. § 63–15–43(2)(b) (Supp.1986) ($20,000 per occurrence minimum limit established). This court has already held that the limits of liability contained in the tortfeasor's policy must be considered in determining a claimant's right to underinsured motorist coverage benefits. *Herrod v. National Indemnity Co.*, 643 F.Supp. 956 (N.D.Miss.1986). Since Mississippi law defines an underinsured vehicle in terms of policy limits, as distinguished from proceeds actually received by a particular claimant, the court in *Herrod* refused to construe "limits of liability under all bodily injury liability insurance" as the amount actually received by the claimant. *Id.*

The amount of the claimant's damages is also irrelevant when determining eligibility for uninsured motorist benefits. A tortfeasor whose liability insurance limit is in compliance with the $20,000.00 statutory minimum limit is not an uninsured or underinsured motorist. *Id. See also McMinn v. New Hampshire Insurance Co.*, 276 So.2d 682, 685 (Miss.1973).

Underinsured motorist benefits are not recoverable unless the tortfeasor's bodily injury liability limit is less than the applicable limit of uninsured motorist coverage. *Herrod, supra.* Since the liability limit of $25,000.00 per occurrence under the USF & G policy exceeds the $20,000.00 bodily injury limit available to Mrs. Wilson under the law, the court concludes that the two truck drivers were not underinsured motorists as defined by the Mississippi Uninsured Motorist Act and Mrs. Wilson's policy. Thus, Mrs. Wilson is not eligible for underinsured motorist coverage.

**B. The Requirement of Negligence.**

Plaintiff asserts that the court should consider only the amount of proceeds actually received under the USF & G policy in determining the question of eligibility for uninsured motorist coverage. Since she received only $20,000.00, reducing her entitlement to $40,000.00 results in a net eligibility of $20,000.00.

The court has already declined to adopt this position for the above-mentioned reasons. Nevertheless, even assuming that plaintiff's arguments were sound, the court finds that Nationwide is still entitled to judgment as a matter of law.

Mrs. Wilson's right to recovery rests upon the court finding that the driver of the second truck was negligent in the operation of his vehicle. The court finds, however, that the evidence is to the contrary and that Jimmy Carlini was not negligent on the date in question. Mrs. Wilson, therefore, fails to show that she would be legally entitled to recover from Carlini in a court of law and is unable to utilize the second accident for the purpose of calculating eligibility for UM benefits.

**C. The Reliance Approach.**

Mrs. Wilson has urged the court to calculate the amount of UM coverage she is entitled to recover based upon the amount she thought she was provided under the terms of the Nationwide policy. Although this "reliance approach" has some appeal, it is without support of Mississippi statutes or court decisions. As the Fifth Circuit recently warned,

As a federal court, "it is not for us to adopt innovative theories of [state law], but simply to apply that law as it currently exists," and to rule as we believe

the state's highest tribunal would rule. We are emphatically not permitted to do merely what we think best; we must do that which we think the Mississippi Supreme Court would deem best. If the law of Mississippi is to be changed, "[i]t is up to the Supreme Court of [Mississippi] and not this court to change the substantive law of that state." Finally, "under *Erie* we cannot skirt the clear import of the state decisional law solely because the result is harsh."

*Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 397 (5th Cir.1986), *cert. denied*, — U.S. —, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). The court declines to adopt the "reliance approach" in this instance.

Let the judgment issue accordingly.

## JUDGMENT

Pursuant to a Memorandum Opinion this day rendered, it is hereby ORDERED:

That judgment is hereby rendered for the defendant and that plaintiff take nothing. Plaintiff is taxed with the costs of these proceedings.